UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------

SARA HAKIMI,

                          Plaintiff,

             -v.-

GUIDANT GLOBAL; IMPELLAM NA SUPPORT
SERVICES, INC.; CORPORATE EMPLOYMENT
RESOURCES, INC.; CAROL HECTOR; and
KAREN SCHLEUDER,

                          Defendants.

--------------------------------------------------

22 Civ. 8765 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Between November 29, 2021, and December 3, 2021, Plaintiff Sara Hakimi corresponded with Defendant Guidant Global ("Guidant") as part of an employment verification process in connection with Plaintiff's anticipated work at non-party BNP Paribas. The correspondence was contentious, in part due to Plaintiff's belief that Guidant's process was fragmented and not secure, and her concomitant reticence to disclose sensitive personal information. Things came to a head on December 1, 2021, when Plaintiff was asked to provide Guidant with a completed Form I-9 and to participate in Guidant's process to verify the Form and supporting documentation through an authorized third party, to which process Plaintiff strenuously objected.

In the days that followed, an unnamed individual at either Guidant or Defendant Corporate Employment Resources, Inc. ("CER") informed BNP Paribas of Plaintiff's obstinance. In that exchange, the individual advised BNP Paribas that Plaintiff had not timely provided the necessary information for

Guidant's verification of her employment, and that the delay had impeded Guidant's ability to approve Plaintiff for work at the bank.  Perhaps more importantly for the instant litigation, that individual also expressed to BNP Paribas that Plaintiff had been "rude" and "uncooperative" during the process. Due to the delay in verifying Plaintiff's information, BNP Paribas ultimately canceled Plaintiff's offer of employment.

Plaintiff not only vehemently disagrees with these characterizations of her conduct and demeanor, but also asserts that the statements were defamatory.  Plaintiff maintains that she had in fact provided all the necessary information, including a Form I-9, to be onboarded at Guidant, and should have been approved for work as a matter of course.  As Plaintiff explains it, the delays in her onboarding were in retaliation for her decision to express her criticism of the onboarding process to several employees of either Guidant or CER, including Defendant Carol Hector.  This criticism, in turn, prompted some combination of Guidant, CER, and/or Hector to defame Plaintiff to BNP Paribas and thereby sabotage her position.  Separately, Plaintiff asserts a claim for tortious interference with prospective economic advantage against Guidant, CER, and Hector, as well as against Defendants Impellam Group ("Impellam") and its employee, Karen Schleuder (together with Guidant, CER, Hector, and Impellam, "Defendants"), and a claim for vicarious liability against Guidant and Impellam.

Now before the Court are Plaintiff's motion for leave to file a Second Amended Complaint (the "SAC" (Dkt. #50-2)), pursuant to Federal Rule of Civil

Procedure 15(a)(2), and Defendants' motion to dismiss the First Amended Complaint (the "FAC" (Dkt. #42)), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in the remainder of this Opinion, the Court grants Defendants' motion to dismiss in its entirety and denies Plaintiff's motion to amend.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff has worked as a banking and finance contractor for over twenty years, in the specialized areas of regulatory reporting and risk reporting. (FAC ¶ 15). Guidant is a managed service provider, offering outsourced professional services to entities such as BNP Paribas. (*Id.* ¶ 16). CER and Impellam are both companies involved in the human resources ("HR") process through which Guidant onboards contractors prior to those contractors beginning work at Guidant's clients. (*Id.* ¶ 21).

For two years, from September 25, 2019, through September 25, 2021, Plaintiff worked as a contractor for BNP Paribas through non-party Maltem

---

[1]    This Opinion draws its facts primarily from Plaintiff's First Amended Complaint ("FAC" (Dkt. #42)), the well-pleaded allegations of which are taken as true for purposes of this motion. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). In considering Plaintiff's motion to amend, the Court also considers Plaintiff's Original Complaint ("OC" (Dkt. #1)), and Plaintiff's proposed Second Amended Complaint ("SAC" (Dkt. #50-2)).

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of her motion to amend as "Pl. Br." (Dkt. #51); to Defendants' consolidated memorandum of law in support of their motion to dismiss and in opposition to Plaintiff's motion to amend as "Def. Br." (Dkt. #56); to Plaintiff's consolidated brief in opposition to Defendants' motion to dismiss and in further support of her motion to amend as "Pl. Opp." (Dkt. #59); and to Defendants' reply brief as "Def. Reply" (Dkt. #62). Except as otherwise noted, the Court's citations to Plaintiff's written submissions are not edited, but rather reflect Plaintiff's typographical and grammatical conventions.

Consulting Group.  (FAC ¶ 16).  When Plaintiff's contract ended, BNP Paribas advised her that it wanted to renew its consulting relationship with Plaintiff, with a proposed tentative start date in early December 2021.  (*Id.* ¶ 17). Plaintiff and her manager at BNP Paribas verbally agreed that she would return to work with the bank, prompting her manager to begin the process of obtaining approval to rehire Plaintiff as a contractor.  (*Id.*).

After Plaintiff's manager secured the necessary approvals for Plaintiff's employment, Plaintiff was instructed to work with Guidant, BNP Paribas's preferred vendor for external consultants, to onboard as an employee with Guidant.  (FAC ¶¶ 16, 18).  This process began on or about November 22, 2021, when Plaintiff received an email from Haddad containing an offer of employment with Guidant as a consultant to BNP Paribas.  (*Id.* ¶ 19).  One week later, on or about November 29, 2021, Plaintiff emailed Haddad inquiring about the timing of the onboarding process with Guidant and its potential implications for her early-December start date at BNP Paribas.  (*Id.* ¶ 20).  This email prompted a phone conversation between Plaintiff and Haddad on that same day, in which conversation Plaintiff relayed her concerns to Haddad about the delay in processing her onboarding and the impact of that delay on her start date.  (*Id.*).

Thereafter, Haddad sent Plaintiff a link to a portal where Plaintiff could input her onboarding information.  (FAC ¶ 21).  On or before December 1, 2021, Plaintiff accessed the portal and input, among other information, her full legal name, date of birth, Social Security Number ("SSN"), New York driver's

license number, current address, professional references, and academic documents.  (*Id.* ¶¶ 21-22).  Altogether, and by November 30, 2021, Plaintiff had provided her personal information through "seven [] different portals, including Equifax, COREstaff, [] Guidant and USCIS, Employment Center Portal for [] Impellam, a portal for the ORSUS Group and a portal for MEDright Urgent Care."  (*Id.* ¶ 21).

The onboarding process was not without incident.  As Plaintiff explains, she "was asked to provide a photocopy of her Green Card via an unsecure email to [Haddad] at [Guidant].  The Plaintiff balked at this and let [Haddad] know about her concerns about avoiding identity theft.  Ultimately, the Plaintiff relented and actually sent the photocopy through email to [Haddad]."  (FAC ¶ 21(f)).  Additionally, "[]though not required, Plaintiff provided copies of her W-2s to [Haddad], but under protest."  (*Id.* ¶ 21(h)).

Plaintiff's frustration with the onboarding process boiled over on December 1, 2021, when Plaintiff reached the employment verification stage, at which point Haddad "imposed a second requirement that the Plaintiff ask a third party to step in and verify her documentation and re-submit her documentation to Guidant."  (FAC ¶ 23).  According to Plaintiff, this verification requirement was both unnecessary, given her extensive submission of information and records via the earlier portal, and burdensome, as the process required an in-person meeting with a third party who could verify Plaintiff's identification documents and submit them to Guidant.  (*Id.* ¶¶ 22-23).

Rather than proceed with the verification, Plaintiff explained to Haddad that she did not know anyone in New York City that she wanted to task with the verification process or to whom she wanted to expose her personal information, and that she believed it was Guidant's responsibility to conduct the verification.  (FAC ¶¶ 24-25).

Faced with strong opposition from Plaintiff, Haddad escalated the issue to Hector, who called Plaintiff on December 3, 2021.  (FAC ¶ 27).  In that conversation, Plaintiff provided her "critiques of the onboarding process and her identification of subpar practices during her onboarding," including Guidant's request that "Plaintiff [] use a third party to complete section 2 of the I-9 which would unnecessarily expose Plaintiff's … personal identifying information."  (*Id.*).  This conversation was not cordial, and Plaintiff reports that "Hector became increasingly annoyed with Plaintiff for her critiques of the onboarding process and her identification of subpar practices during her onboarding."  (*Id.*).  Still, according to Plaintiff, Hector agreed at the end of the call to process Plaintiff's Form I-9 manually, so that Plaintiff would not have to go through Guidant's third-party verification process.  (*Id.* ¶ 28).  Hector also promised to send Plaintiff the Form I-9 to enable Hector's manual processing of the materials.  (*Id.*).

At some point after this call, Hector, or another employee of Defendants acting under Hector's direction, communicated with the HR Department at BNP Paribas regarding the status of Plaintiff's onboarding.  (FAC ¶ 30).  In this communication, the employee expressed to BNP Paribas that Plaintiff was

"being uncooperative and rude" during the hiring process, and that Plaintiff "had not provided the necessary documents" or information to complete the hiring process, "including not providing information for her Form I-9." (*Id.*). Plaintiff learned about this conversation on December 9, 2021, when Plaintiff received a call from her manager at BNP Paribas, who had been informed by Guidant that Plaintiff had been "very difficult, uncooperative and rude during the hiring process and failed to provide all necessary documentation related to the processing the I-9 with [] Guidant." (*Id.* ¶ 31).

On December 14, 2021, Hector sent a Form I-9 to Plaintiff via email. (FAC ¶ 28). Plaintiff mostly filled out the Form, except for her SSN, which Plaintiff asked that she be able to provide to Hector over the phone. (*Id.* ¶ 29). Hector refused and insisted Plaintiff send the completed documents, including her SSN, via email, which Plaintiff did on or about December 15, 2021. (*Id.*). After receiving no response from Guidant, Plaintiff re-sent her documents to Hector on December 22, 2021. (*Id.*). That same day, Hector responded to Plaintiff's email, confirming receipt of the materials, but indicating that she was "not sure the role is available" in light of the delays in Plaintiff's onboarding process. (*Id.* ¶ 32).

After learning that her opportunity with BNP Paribas might no longer be available, Plaintiff wrote to Guidant's HR department; later, she received an email response from Schleuder, the North America Human Resources Manager for Impellam. (FAC ¶ 34). Schleuder spoke on the phone with Plaintiff on January 19, 2022, during which conversation Plaintiff recounted the problems

she had encountered during the hiring process, "including the subpar onboarding practices engaged in by [Haddad and Hector]." (*Id.* ¶ 36). On January 30 and 31, 2022, Plaintiff received follow-up emails from Schleuder in which the latter admitted to confusion and delays in Plaintiff's hiring process, and stated that Haddad took "full responsibility" for these delays. (*Id.* ¶ 37). Still, Schleuder informed Plaintiff that CER would not continue processing Plaintiff's onboarding "based upon alleged problems with [Plaintiff] completing her I-9," and that BNP Paribas had been notified by Guidant that Plaintiff's incomplete I-9 had held up the processing of her candidacy. (*Id.*). In her last email to Plaintiff, on February 1, 2022, Schleuder indicated to Plaintiff that "[t]he final decision to cease on-boarding [Plaintiff] through [CER] was [due to] delays in completing all employment compliance documents which included the I-9." (*Id.* ¶ 38).

## B.    Procedural History

Plaintiff initiated the instant lawsuit on October 14, 2022, with the filing of a six-count complaint against Defendants. (Dkt. #1 (the "Original Complaint" or the "OC")). In the OC, Plaintiff brought several employment-related claims under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 301, the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134, and the New York Labor Law (the "NYLL"), N.Y. Lab. Law §§ 190 to 199. In particular, Plaintiff asserted a claim for wrongful request for documents containing salary history, in violation of N.Y.C. Admin. Code § 8-107(25), and a claim for retaliation and

wrongful termination, in violation of N.Y. Labor Law § 740, N.Y. Exec. Law § 296(7), and N.Y.C. Admin Code § 8-107(7).  (*See* OC ¶¶ 38-51).  Plaintiff also brought a claim against Hector and Schleuder for aiding and abetting her wrongful termination, in violation of N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(7).  (*See id.* ¶¶ 52-55).  Finally, Plaintiff asserted common-law claims for "negligent hiring, retention, supervision, and/or training" (*see id.* ¶¶ 56-70); for vicarious liability (*id.* ¶¶ 71-85); and for tortious interference with prospective economic advantage (*id.* ¶¶ 86-89).

On January 23, 2023, Judge Colleen McMahon — the judge to whom this case was originally assigned — entered a Civil Case Management Plan, which plan required amended pleadings to be filed by April 24, 2023.  (Dkt. #23).  On February 21, 2023, in lieu of an answer, Defendants filed their first motion to dismiss.  (*See* Dkt. #25-28).  Soon after, on March 2, 2023, Defendants filed a letter motion seeking to stay discovery pending Plaintiff's filing of an amended complaint and Defendants' anticipated motion to dismiss. (Dkt. #32).  This request was denied by Judge McMahon as premature in light of the initial pretrial conference then scheduled for March 16, 2023.  (Dkt. #33).  On March 6, 2023, however, Plaintiff filed a letter, *pro se*, requesting an extension of time to respond to the motion to dismiss, as well as an adjournment of the pretrial conference to early April 2023.  (Dkt. #34).  Plaintiff represented that she did not wish for her then-counsel to represent her in the matter, and that the extensions were necessary to accommodate a possible change in counsel.  (*Id.*).

On March 8, 2023, this case was reassigned from Judge McMahon to the undersigned. (*See* March 8, 2023 Minute Entry). Shortly thereafter, this Court granted Plaintiff's letter request for a brief adjournment of the pretrial conference, pending her retention of new counsel. (Dkt. #37). On April 5, 2023, the Court held the initial pretrial conference, at which the parties discussed Plaintiff's intent to amend her complaint and Defendants' position on a motion to dismiss. (*See* April 5, 2023 Minute Entry). Ultimately, the Court approved Plaintiff's change in counsel and set deadlines (i) for Plaintiff to file her Amended Complaint, and (ii) for Defendants to express their intention to file either an answer or a renewed motion to dismiss. (*Id.*).

Plaintiff filed her First Amended Complaint, the operative complaint in this matter, on April 20, 2023. (*See generally* FAC). Of note, the FAC takes a markedly different approach to the theories of liability alleged in connection with the underlying dispute, dropping the NYSHRL, NYCHRL, and NYLL claims, and pivoting to the defamation theories that are the subject of the instant motion to dismiss. (FAC ¶¶ 39-51). In particular, and as noted above, the FAC contains one count of libel and one count of slander against Hector, Guidant, and CER, based on the alleged false statements made to BNP Paribas regarding Plaintiff's conduct during the Guidant onboarding process. (*Id.*). On the common-law front, the FAC maintains the claims for tortious interference and vicarious liability, though it drops the claim for negligent supervision. (*Id.* ¶¶ 52-74).

10

Defendants filed a pre-motion letter on May 2, 2023, seeking leave to file a motion to dismiss the FAC.  (*See* Dkt. #44; *see also* Dkt. #43 (Order denying Defendants' first motion to dismiss as moot)).  In light of the productive April 5, 2023 conference with the parties, the Court forwent its usual pre-motion conference process, and instead set a briefing schedule for the motion to dismiss.  (Dkt. #45).  Prior to Defendants filing their opening brief, however, Plaintiff filed a letter on May 24, 2023, requesting a pre-motion conference in connection with her intent to seek "limited scope discovery" regarding the contractual relationships between Guidant and BNP Paribas, leave to add BNP Paribas as a defendant, and leave to file a Second Amended Complaint.  (Dkt. #46).  The next day, the Court denied Plaintiff's request for a conference, noting that it would be disinclined to allow Plaintiff to engage in any discovery concerning BNP Paribas, and that it was Plaintiff's responsibility to add BNP Paribas as a party defendant, provided such addition was appropriately supported by Plaintiff's counsel's pre-suit investigation.  (Dkt. #47).  As to Plaintiff's anticipated motion for leave to amend, the Court expressed that it "[did] not fully understand why Plaintiff failed to include these allegations in the [FAC]," given that Plaintiff had already discussed amendments in the April 5, 2023 conference just two months earlier, and that such facts "were readily knowable before the filing of the [FAC]."  (*Id.*).  And while the Court granted Plaintiff leave to amend "solely to add BNP Paribas or to add minor factual detail," it cautioned Plaintiff that it "w[ould] not accept further amendments beyond that prior to motion practice."  (*Id.*).

11

On May 31, 2023, the Court adopted the briefing schedule set forth in a joint letter filed by the parties. (Dkt. #49). On June 12, 2023, Plaintiff filed her motion to amend. (Dkt. #50, 51 (Pl. Br.)). On July 17, 2023, Defendants filed a consolidated motion to dismiss and opposition to Plaintiff's motion to amend. (Dkt. #54, 55, 56 (Def. Br.)). Plaintiff filed her consolidated reply in further support of her motion to amend and in opposition to Defendants' motion to dismiss on August 14, 2023. (Dkt. #59 (Pl. Opp.)). Finally, on September 1, 2023, Defendants filed their reply in further support of their motion to dismiss. (Dkt. #62 (Def. Reply)).

<b>DISCUSSION</b>

**A.    Applicable Law**

**1.    Motions to Dismiss Under Rule 12(b)(6)**

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is entitled to relief if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47,

50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022). Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and may "disregard allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Exch. Listing, LLC* v. *Inspira Techs., Ltd.*, — F. Supp. 3d —, No. 22 Civ. 1889 (KPF), 2023 WL 2403223, at *4 (S.D.N.Y. Mar. 8, 2023) (quoting *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted)). As a practical matter, this law forecloses the

Court from considering Plaintiff's "Declaration of Facts," which is appended to her reply brief.  (Dkt. #59-1 ("Pl. Decl.")).

What is more, when deciding a motion to dismiss, a court need not consider new factual allegations in memoranda, affidavits, and declarations appended to motion papers, which constitute extra-pleading material filed by the parties.  *See, e.g.*, *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (allowing courts, when deciding motions to dismiss, to disregard extra-pleading material filed by the parties); *see also Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016) (concluding that district court "erred in roaming outside the pleadings").  To do otherwise would permit Plaintiff impermissibly to amend her pleadings in her opposition submission. *See generally Shah* v. *Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint").

### 2. Motions to Amend

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'" *Id.* (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

That said, "it remains 'proper to deny leave to replead where ...
amendment would be futile.'"  *Gorman*, 2014 WL 7404071, at *2 (quoting *Hunt*
v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).  When
assessing futility, the court employs a standard comparable to that utilized in
assessing a motion to dismiss under Rule 12(b)(6).  *Milanese* v. *Rust-Oleum
Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (observing that "leave to amend will be
denied as futile only if the proposed new claim cannot withstand a 12(b)(6)
motion to dismiss").  Ultimately, whether to grant leave to amend is addressed
to the Court's discretion.  *See Krupski* v. *Costa Crociere S. p. A.*, 560 U.S. 538,
553 (2010) ("Rule 15(a) gives discretion to the district court in deciding whether
to grant a motion to amend a pleading to add a party or a claim.").

### 3.     Defamation Under New York Law

Because subject matter jurisdiction in this case is based upon diversity
of citizenship, the Court applies the choice of law rules of the forum state.  *See
Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  New York choice
of law rules mandate application of the substantive law of the state with the
most significant relationship to the alleged tort.  *See Reeves* v. *Am. Broad. Cos.*,
719 F.2d 602, 605 (2d Cir. 1983) (citing *Nader* v. *Gen. Motors Corp.*, 25 N.Y.2d
560 (1970)).  Defendants assert, and Plaintiff does not contest, that New York
law applies in this case.  (*See* Def. Br. 13).  The Court agrees, given that
Plaintiff alleges that Defendants were transacting business in New York and
made the allegedly defamatory statements within the state in connection with
that work.  (*See* FAC ¶¶ 9-13)

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Albert* v. *Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (internal quotation marks and citation omitted). Spoken defamatory words are generally considered slander, while written defamatory words are libel. *Id.* In this case, Plaintiff alternatively alleges libel and slander, though she maintains that the allegedly defamatory statements supporting both counts are the same.

Under New York law, to state a claim for defamation, a plaintiff must allege "[i] a written [or spoken] defamatory statement of and concerning the plaintiff, [ii] publication to a third party, [iii] fault, [iv] falsity of the defamatory statement, and [v] special damages or *per se* actionability." *Palin* v. *N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Of critical importance in the defamation analysis are the content and character of the allegedly defamatory statements. "Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action." *Gross* v. *N.Y. Times Co.*, 82 N.Y.2d 146, 152-53 (1993) (internal quotation marks and citation omitted).

**B.    The Court Dismisses Plaintiff's FAC**

**1.    Plaintiff's Defamation Claims Are Based on Non-Actionable Statements of Opinion and Fact, and Must Be Dismissed**

Defendants argue that Plaintiff's defamation claims must be dismissed because (i) the first two challenged statements, that Plaintiff was "rude" and "uncooperative," constitute non-actionable statements of opinion rather than

16

false statements of fact, and (ii) the remaining statement, that Plaintiff "failed to provide necessary information" and complete a Form I-9 during the hiring process, was substantially true.

Plaintiff's efforts to refute each of these arguments are discussed in the remainder of this section.  As an initial matter, however, the Court observes that Plaintiff's opposition to Defendants' motion is devoid of any case law pertinent to her defamation claims.  Nor does Plaintiff identify any case law in support of her related claims for tortious interference with prospective economic advantage and vicarious liability.  Where Plaintiff cites any cases at all, she does so in an effort to remind the Court of the legal standard for the motion to dismiss, under which standard she suggests that such motions are "generally viewed with disfavor."  (Pl. Opp. 16 (citing *Jackson* v. *New York*, 381 F. Supp. 2d 80, 85 (N.D.N.Y. 2005))).

Such an argument overstates the relevant law.  While it is true that for the purposes of a motion to dismiss, the Court must assume Plaintiff's well-pleaded allegations are true and must draw all reasonable inferences in the Plaintiff's favor, there is no general presumption against motions to dismiss.  In fact, "[b]ecause a defamation suit 'may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself,' courts should, where possible, resolve defamation actions at the pleading stage." *Adelson* v. *Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) (quoting *Washington Post Co.* v. *Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

Moreover, while Defendants bear the burden on their motion to dismiss, it is Plaintiff that bears the ultimate burden of proof in this action. To the extent that Defendants, through application of the relevant case law to the allegations in the FAC, demonstrate that Plaintiff has not satisfied a necessary element of her claim, the burden is on Plaintiff to provide a counter-argument, supported by the relevant case law. As is well established, "judges 'are not like pigs, hunting for truffles buried in briefs' or the record." *Potter* v. *District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (quoting *United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Nor is the Court "obliged to sift through a large [] record against the possibility that it will find something to warrant denial of the motion that the non-moving party has not bothered to call to its attention." *Morisseau* v. *DLA Piper*, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008). With this backdrop in mind, the Court proceeds to analyze the allegedly defamatory statements.

### a. The Alleged Statements That Plaintiff Was "Rude" and "Uncooperative" Are Non-Actionable Statements of Opinion

Central to the parties' dispute over the first two statements is the "distinction between expressions of opinion, which are not actionable, and assertions of fact, which may form the basis of a viable libel claim." *Gross*, 82 N.Y.2d at 151. Because "falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, it follows that only statements alleging facts can properly be the subject of a defamation action."

18

*Rosner* v. *Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015) (citations and internal quotation marks omitted).

"[W]hether a statement constitutes a personal opinion or a statement of fact is a question of law for determination by the court." *Davis* v. *Ross*, 754 F.2d 80, 85 (2d Cir. 1985) (citing *Rinaldi* v. *Holt Rinehart & Winston*, 42 N.Y.2d 369, 382 (1977)). In making such a determination, the court's analysis is twofold. First, the court evaluates "whether a communication is 'opinion' or 'fact.'" *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006) (citing *Steinhilber* v. *Alphonse*, 68 N.Y.2d 283, 292 (1986)). Under New York law, the court "appl[ies] three factors in determining whether a reasonable reader would consider the statement connotes fact or nonactionable opinion." *Davis* v. *Boeheim*, 24 N.Y.3d 262, 270 (2014). These factors are: (i) whether the statement in issue has a precise, readily understood meaning; (ii) whether the statement is capable of being proven true or false; and (iii) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read is likely to be opinion, not fact. *Id.* In applying these factors, the court adopts a "holistic approach," under which it looks "to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the plaintiff." *Id.* (internal quotation marks omitted and alteration adopted) (citing *Brian* v. *Richardson*, 87 N.Y.2d 46, 51 (1995)). "The burden rests with the plaintiff to establish that in

the context of the entire communication a disputed statement is not protected opinion." *Celle* v. *Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000).

If the court finds the statement to contain opinion, "[it] must next determine whether the statement is 'pure opinion' (and thus non-actionable) or 'mixed opinion' (and therefore actionable)." *Chau* v. *Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). "Pure opinion is a 'statement of opinion which is accompanied by a recitation of the facts upon which it is based' or does not imply that it is based on undisclosed facts." *Id.* (citing *Steinhilber*, 68 N.Y.2d at 289-90). "Mixed opinion, on the other hand, is an opinion that does imply a basis in undisclosed facts, or facts known only to the author, and is actionable." *Id.*

Turning to the facts at hand, this Court first briefly considers the statement that Plaintiff was "rude," which statement the Court easily finds to be a non-actionable expression of pure opinion. As Defendants correctly observe, the term "rude" is an inherently "subjective characterization[] which could not be objectively verified." (Def. Br. 16 (quoting *Morrison* v. *Poullet*, 643 N.Y.S.2d 185, 185 (2d Dep't 1996))). Plaintiff acknowledges as much, conceding that "'rude' ... is a more subjective word, than ... 'uncooperative,' which [has] an objective meaning." (Pl. Opp. 14). Nor does Plaintiff suggest that the statement implied a basis in facts that were not disclosed to the reader or listener. As such, the statement that Plaintiff was "rude" cannot suffice to establish a defamation claim.

Likewise, the statement that Plaintiff was "uncooperative" is also one of pure opinion and must be dismissed. Plaintiff disputes this conclusion,

arguing that "uncooperative" has an "objective" meaning, such that it may be proved true or false.  (Pl. Opp. 14).  In doing so, Plaintiff relies exclusively on the Oxford English Dictionary ("OED") definition of "cooperative" as "[o]f or relating to cooperation; having the quality or function of cooperating."  (*Id.* (quoting *Cooperative*, OXFORD ENGLISH DICTIONARY (revised Sept. 2022), https://doi.org/10.1093/OED/2190721025 (last visited Nov. 16, 2023))).  As to the facts rendering the descriptor false, Plaintiff maintains that she actually cooperated with Defendants, notably by providing them with their desired information by November 30, 2021.  (*Id.* at 14-15).  In reply, Defendants assert that "'*un*cooperative' is defined as 'unwilling to help others or do what they ask,'" and that its use represented Defendants' opinion about the willingness (or not) of Plaintiff to participate in Guidant's onboarding process.  (Def. Reply 9 (emphasis added)).  *See also Uncooperative*, OXFORD ENGLISH DICTIONARY (revised July 2023), https://doi.org/10.1093/OED/1097613196 (last visited Nov. 16, 2023).

The Court agrees with Defendants.  Plaintiff may well be correct that "uncooperative" can be generalized to a degree that the term can be technically characterized as true or false, based on whether there existed a single instance of cooperation.  *See Davis*, 24 N.Y.3d at 270.  But the test for opinion versus fact does not end there, as the Court must consider "the full context of the communication in which the statement appears" in order to determine if a reasonable reader or listener would understand the statement to be opinion, not fact.  *Id.*  And, as Defendants correctly observe, the broader context here

reveals that Plaintiff was an unobliging participant in Guidant's onboarding process, including by making "various objections to standard onboarding procedures and [adopting a] critical tone when interacting with Defendants and HR personnel." (Def. Reply 8). A reasonable reader or listener, aware of this context, would understand the statement to represent Defendants' opinion regarding the begrudging quality of Plaintiff's actions. *Cf. Jeanty* v. *Cerminaro*, No. 21-1974, 2023 WL 325012, at *7 (2d Cir. Jan. 20, 2023) (summary order) (finding defendants' characterization of plaintiff "as a 'difficult individual,'" when read in the broader context of the statement, "[was] not an objective fact that could be proven to be true or false," and therefore was a non-actionable expression of pure opinion). Further, as with "rude," Plaintiff does not argue that the characterization of her as "uncooperative" implied a basis in facts that are not disclosed to the reader or listener. Ultimately, therefore, the Court finds that neither statement can support Plaintiff's claims of defamation.

> **b.    The Alleged Statement That Plaintiff Failed to Provide a Completed Form I-9 Was Substantially True**

Next, the Court considers the final defamatory statement: that Plaintiff "failed to provide necessary information [and] to complete an I-9 during the hiring process." (FAC ¶¶ 40, 47). Here, Defendants adopt a different tack, arguing that the statement was substantially true. (Def. Br. 14-16; Def. Reply 6-8). In particular, Defendants contend that the statement, made at some point between December 3, 2021, and December 9, 2021, was made after Plaintiff had expressly refused to follow Guidant's onboarding procedures in

conversations with Haddad and Hector, including by refusing to submit a completed Form I-9 and related verification documents.  (Def. Reply 7-8).

Plaintiff offers two arguments in response.[2]  *First*, Plaintiff argues that she had already provided extensive personal information, including via the onboarding portals, which information should have been sufficient to satisfy the requirements of the Form I-9 and obviate the need to provide the Form in standalone format.  (Pl. Opp. 17-18).  *Second*, Plaintiff contends that she had agreed with Hector on a manual verification process, and that her Form I-9 had not been completed because Plaintiff was waiting on Hector to send her a copy of the form.  (*Id.* at 18).  Ultimately, and as discussed below, the Court finds that the facts as alleged establish that Plaintiff had not provided a completed Form I-9 by December 9, 2021, when Plaintiff learned that the allegedly defamatory statement had been made, thereby rendering Defendants' alleged statement substantially true.

As laid out above, "falsity — or lack of substantial truth — is an element of a New York defamation claim, [and] it follows that a plaintiff must plead facts demonstrating falsity to prevail on a motion to dismiss the complaint."

---

[2]    In connection with these arguments, Plaintiff also provides a number of critical observations about the appropriateness and efficacy of the various steps in Guidant's onboarding process, none of which is relevant to the defamation claims at the heart of this case. (*See, e.g.*, Pl. Opp. 18, 20).  However, defamation is principally concerned with whether an author or speaker has made a false statement regarding an individual. *See Gross* v. *N.Y. Times Co.*, 82 N.Y.2d 146, 152-53 (1993) (observing that "falsity is a necessary element of a defamation cause of action").  Accordingly, Plaintiff cannot carry her burden to establish defamation merely by arguing that she was correct in her belief that Guidant's onboarding process was inefficient; that the various steps in the process were redundant and therefore unnecessary; and that she was justified in refusing to complete additional steps because of her own opinion that such steps were unsecure.

*Tannerite Sports, LLC* v. *NBCUniversal News Grp., a div. of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017).  As the Second Circuit has explained, "a statement need not be completely true" to defeat a defamation claim; it need only be "substantially true."  *Tolbert* v. *Smith*, 790 F.3d 427, 440 (2d Cir. 2015) (quoting *Chau*, 771 F.3d at 129).  "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Tannerite Sports*, 864 F.3d at 242-43 (alteration adopted) (quoting *Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012)).  Moreover, when making such a determination, "[t]he entire [statement], as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader."  *Id.* at 243 (quoting *Silsdorf* v. *Levine*, 59 N.Y.2d 8, 13 (1983)).

In this context, assessing the truthfulness of Defendants' statement requires a brief detour into the realm of employment verification regulations.[3] Almost anybody who has started a job in the United States has encountered the Form I-9.  *See* U.S. CITIZENSHIP & IMMIGR. SERVS. ("USCIS"), FORM I-9, OMB No. 1615-0047 (Aug. 1, 2023), https://omb.report/icr/202307-1615-002/doc/133343801.  The Form is a standard, publicly-available worksheet

---

[3]     As explained above, the universe of materials a court may consider on a Rule 12(b)(6) motion includes materials of which the court can take judicial notice, such as "all public documents, promulgated by or binding on a government agency, and not subject to reasonable dispute."  *Richardson* v. *N.Y.C. Bd. of Educ.*, 711 F. App'x 11, 14 (2d Cir. 2017) (summary order).  This includes information from an official government website, as "the website's authenticity is not in dispute and it is capable of accurate and ready determination."  *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (citing *Doron Precision Sys., Inc.* v. *FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)).

used "to verify the identity and employment authorization of individuals hired for employment in the United States." *I-9, Employment Eligibility Verification*, USCIS (last updated Nov. 3, 2023), https://www.uscis.gov/i-9 (last visited Nov. 16, 2023).

Section 1 of the Form I-9 is the employee's responsibility.  She must provide personally-identifying information, including date of birth, address, and SSN, as well as details regarding her citizenship or immigration status, and a signature attesting that all of the information in the Form is correct. *See* USCIS, FORM I-9.  This signature requirement is important, as it guarantees that another party has not completed Section 1 of the Form I-9 on the employee's behalf.  Indeed, if a party does assist the employee, that party must fill out a separate "Supplement A, Preparer and/or Translator Certification for Section 1." *Id.*  Finally, in connection with Section 1, "[t]he employee must also present their employer with acceptable documents as evidence of identity and employment authorization." *I-9, Employment Eligibility Verification*, USCIS.

Section 2 of the Form, by contrast, is the employer's responsibility.  At this step, an employer "or their authorized representative" must physically examine the identity and employment documents provided by the employee, input the relevant information into the Form, and certify that such verification of the forms was conducted to the best of the employer or authorized representative's knowledge.  USCIS, FORM I-9.  Importantly, the verification process requires actual inspection of the physical document(s); photocopies and scans are not acceptable substitutes.  *See* USCIS, INSTRUCTIONS FOR FORM I-

9, at 4 (Aug. 1, 2023), https://www.uscis.gov/sites/default/files/document/
forms/i-9instr.pdf ("Photocopies, except for certified copies of birth certificates,
are not acceptable for Form I-9.").  In the shift to a remote work environment
occasioned by the COVID-19 pandemic, the USCIS introduced some flexibility
into this requirement, such that an employer "may [now] designate [any person
as] an authorized representative to act on their behalf to complete Section 2,"
including to conduct the verification of employment documents.  *DHS
Announces Flexibility in Requirements Related to Form I-9 Compliance*, USCIS
(Mar. 20, 2020), https://www.ice.gov/news/releases/dhs-announces-
flexibility-requirements-related-form-i-9-compliance.

        Turning to the facts of this case, the Court first observes that, while
Plaintiff alleges that she provided certain information and materials between
November 29, 2021, and December 1, 2021, nowhere in the FAC does Plaintiff
allege that she actually provided Defendants with a completed Form I-9 prior to
December 15, 2021.  (*See* FAC ¶¶ 21-29).  At best, Plaintiff alleges only that
she provided the necessary information through various portals, and that the
information — taken together — could be used to complete the various fields
on Section 1 of the Form.  (*See id.* ¶ 21(g) (alleging that Plaintiff "provided
Green Card details for Guidant['s] Section 1 policy I-9 form purposes and Date
of Birth, Social Security number, New York state driver's license for I-9
Section")).  But even these allegations are belied by Plaintiff's admission that
she specifically withheld providing any Form I-9 containing her SSN until on or
about December 15, 2021.  (*Id.* ¶ 29).

As elaborated above, the text of the Form I-9 and its underlying regulations expressly foreclose Plaintiff's argument that she had satisfied her obligation to complete an actual Form I-9 by providing Guidant with the information through various portals.  Neither the Form nor the regulations contain any provision that permits an employer to verify an employee's status based on its piecemeal receipt of the information corresponding with Section 1 of the Form.  Indeed, the opposite is true: the Form I-9 and its corresponding regulations prohibit an employer (or any other third party) from having any part in the preparation of Section 1 of the Form I-9 without receiving express authorization from the employee and filling out the separate Supplement A, neither of which is alleged by Plaintiff to have been the case.  Throughout the process, therefore, the onus remained on Plaintiff to prepare her own Form I-9, including by inputting the necessary details and affixing her signature attesting to their accuracy.  As Plaintiff cannot establish that she actually did so until December 15, 2021, it follows that any statement asserting that Plaintiff had not provided a completed Form I-9 would have been true if made prior to that date.  (FAC ¶ 29).  And because the statement at issue was made between December 3, 2021, and December 9, 2021, the facts as alleged establish that such statement was in fact true.  (*Id.* ¶¶ 30-31).

Even assuming, *arguendo*, that Plaintiff had provided a copy of the Form I-9 with Section 1 completed and signed, it is still the case that Plaintiff refused to provide the necessary identity and employment documents for Guidant's inspection, verification, and completion of Section 2.  For her part, Plaintiff

argues that she had already provided a photocopy of her Green Card, which should have been sufficient for Guidant's purposes, and therefore did not need to provide any additional documents in connection with the verification of her Form. (Pl. Opp. 18-19 (citing FAC ¶ 21(f))). Once again, however, Plaintiff misunderstands the requirements of the Form I-9 verification process, which call for the contemporaneous inspection of the original document — a scan or photocopy is insufficient. USCIS, INSTRUCTIONS FOR FORM I-9, at 4 ("Photocopies, except for certified copies of birth certificates, are not acceptable for Form I-9."). And, to the extent that Plaintiff alleges her obstinance to provide any documentation was justified by her concerns about Guidant's policy of relying on an authorized third party to complete the verification requirement, such argument is irrelevant. All that matters, for the purposes of the defamation analysis, is that Plaintiff did not provide any original identity documents in connection with the Form I-9 verification process, and that Guidant could not complete Section 2 of the Form as a result, making Guidant's representation to BNP Paribas that the Form I-9 could not be completed substantially true.

Nor is it of any significance that Plaintiff and Hector had agreed to verify the Form I-9 manually, or that Plaintiff was waiting on Hector to provide the "manual" Form I-9 before Plaintiff provided her information and identity documents. (*See* Pl. Opp. 18). As Defendants correctly note, this additional context does not change the fact that Plaintiff had expressly refused to provide a completed Form I-9 to Haddad, which refusal necessitated escalation from

Haddad to Hector, to whom Plaintiff again refused to provide a completed Form
I-9 unless she was given an exemption from Guidant's standard verification
process.  (*See* FAC ¶¶ 23-27).  When understood in this context, the statement
that Plaintiff had not provided the necessary information to complete a Form
I-9 remained "substantially true because [it did] not possess any ambiguity as
to [its] truth, even if [it was] not completely true."  *Chau*, 935 F. Supp. 2d at
662 (internal quotation marks and citations omitted); *see also Tannerite*, 864
F.3d at 241-42 ("[A] statement is substantially true and not actionable if the
published statement could have no worse an effect on the mind of a reader
than the truth pertinent to the allegation." (internal quotation marks and
citation omitted)); *see also White* v. *Frat. Order of Police*, 909 F.2d 512, 525
(D.C. Cir. 1990) (finding that "any omissions by the [speaker] were immaterial
because the same impressions would have been created if the omitted material
had been included").

In sum, the Court concludes that each of the three statements identified
by Plaintiff is non-actionable in defamation, as it was either a statement of
pure opinion or a statement that was substantially true.  Thus, Plaintiff's
claims for libel and slander against Guidant, Impellam, and Hector must be
dismissed.

### 2. Plaintiff's Tortious Interference and Vicarious Liability Claims Are Predicated Entirely on Her Defamation Claims and Therefore Also Fail

The Court briefly turns to the remaining claims in the FAC, namely,
Plaintiff's claims for tortious interference with prospective economic advantage

and for vicarious liability.  As to the former, Plaintiff must allege that "[i] [she] had a business relationship with a third party, [ii] the defendant knew of and intentionally interfered with that relationship, [iii] the defendant's interference amounts to 'wrongful means,' and [iv] the defendant's interference caused injury to the relationship." *Friedman* v. *Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 169 (S.D.N.Y. 2008) (citing *Kirch*, 449 F.3d at 400).  Besides her unsupported claims of defamation, Plaintiff does not allege that Defendants interfered with her relationship with BNP Paribas by any other wrongful means, and therefore she cannot sustain her claims.  (Pl. Opp. 22-23 (arguing only that it was "[a]s a result of this misrepresentation and defamation, the Plaintiff's contract with BNP Paribas [] was tanked and Plaintiff lost that economic, contractual opportunity")).

As to vicarious liability, Defendants are correct that "there can be no imposition of vicarious liability in the absence of underlying liability."  (Def. Br. 18 (quoting *Shapiro* v. *Kronfeld*, No. 00 Civ. 6286 (RWS), 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004))).  As is abundantly clear at this stage of the analysis, Plaintiff has not pleaded adequate claims for defamation, nor has she pleaded adequate claims for tortious interference.  Absent any predicate basis for liability, Plaintiff's claims for vicarious liability against Guidant and Impellam also fail.

## C.    The Court Denies Plaintiff's Motion to Amend

Finally, the Court considers Plaintiff's motion to amend a second time. As discussed above, while a court should freely give leave to amend "when

justice so requires," Fed R. Civ. P. 15(a)(2), the court also has the discretion to deny such a request where "there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese*, 244 F.3d at 110.  Moreover, "the failure to fix deficiencies in an initial pleading, after being provided notice of those deficiencies, is alone sufficient ground to deny leave to amend." *Bischoff* v. *Albertsons Cos., Inc.*, — F. Supp. 3d —, No. 22 Civ. 4961 (CS), 2023 WL 4187494, at *7 (S.D.N.Y. June 26, 2023) (citing *Nat'l Credit Union Admin. Bd.* v. *U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018)).

Denial on any of the grounds mentioned in the preceding paragraph would be an appropriate exercise of this Court's discretion, as "a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *Nat'l Credit Union*, 898 F.3d at 258 (citation omitted).  And as the procedural history of this case shows, Plaintiff has adopted exactly such a seriatim tactic.  After Plaintiff became aware, based on Defendants' first motion to dismiss, that her original New York statutory claims were unworkable, she amended her complaint to allege an entirely different theory of liability, this one sounding in defamation.  (*Compare* Dkt. #1 (OC), *with* Dkt. #42 (FAC); *see also* Dkt. #26 (Defendants' Memorandum of Law in Support of the First Motion to Dismiss)).  Thereafter, Defendants filed another pre-motion letter exposing the fact that Plaintiff had again failed to state a claim, prompting Plaintiff again to seek leave to amend.  But as this Court has already noted, "Plaintiff cannot perpetually amend the complaint prior to motion practice, particularly when such facts were readily knowable before the filing of the Amended Complaint."

(Dkt. #47 at 4).  *See also Nat'l Credit Union*, 898 F.3d at 257-58 ("When a plaintiff was aware of the deficiencies in [her] complaint when [she] first amended, [she] clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." (internal quotation marks and citation omitted)).  With this standard in mind, in its May 25, 2023 endorsement, the Court granted Plaintiff leave to file "another amended complaint solely to add BNP Paribas or to add *minor* factual detail." (Dkt. #47 at 4 (emphasis added)).  Yet, as discussed below, Plaintiff's proposed amendments go far outside the scope of the Court's order.  And even considering the substance of the proposed amendments, the Court finds that none would rescue Plaintiff's claims from the instant motion to dismiss.

Most significantly, Plaintiff now seeks to rewrite the chronology of her submission of her Form I-9.  In her first two complaints, Plaintiff pleaded that she had submitted all of her information via the various portals, after which submission Plaintiff was contacted by Haddad regarding the Form I-9.  (OC ¶¶ 19-21; FAC ¶¶ 21-23).  In the proposed SAC, however, Plaintiff now maintains that, after submitting her information via the various portals, "[she] received an email from Equifax stating to her that she had, 'successfully completed [her] New Hire Packet,'" which packet "included the Plaintiff's completed I-9." (SAC ¶ 23).  This addition is too little, too late.  As discussed above, this fact was known to Plaintiff prior to the filing of the FAC, and Plaintiff was fully aware of its centrality to the case when preparing the FAC, given that the issue of Plaintiff's refusal to complete the Form I-9 paperwork

was raised in Defendants' original motion to dismiss. (Dkt. #26 at 4-5). *Cf.*
*Benzon* v. *Morgan Stanley Distribs., Inc.,* 420 F.3d 598, 613-14 (6th Cir.
2005) (upholding denial of leave to amend after first dismissal, where plaintiff
previously filed an amended complaint after having notice of defects from a
previous motion to dismiss that was filed but not decided). This Court will not
grant Plaintiff leave to revise the narrative a third time in an attempt to
sidestep Defendants' motion to dismiss.

Moreover, Plaintiff's new allegation that her New Hire Packet included a
completed Form I-9 remains at odds with her prior representation that she
expressly refused to provide a fully complete Form I-9 to Haddad and Hector.
To this point, through her proposed amendments, Plaintiff attempts to remove
the details of her conversation with Hector, in which she admitted to refusing
to provide the complete Form I-9. (*Compare* OC ¶ 29 (alleging that Plaintiff
prepared her Form I-9 without the SSN, which information Plaintiff asked to
provide over the phone), *and* FAC ¶ 29 (same), *with* SAC ¶ 29 (striking those
details regarding Plaintiff's phone conversation with Hector)). This bad-faith
proposal is unavailing, as the "assertion of fact in a pleading is a judicial
admission by which [the party] normally is bound throughout the course of the
proceeding." *Pacheco* v. *Serendensky*, 393 F.3d 348, 354 (2d Cir. 2004)
(internal quotation marks and citation omitted). And even accepting as true
that Plaintiff may have received a completed copy of a Form I-9 — which the
Court does not — such an allegation does not change the fact that Plaintiff
expressly refused to submit to the verification process of her identity and

employment documents, which process was necessary for the completion of Section 2 of her Form I-9.  Therefore, it remains substantially true that Plaintiff did not provide Guidant with the necessary information to complete her Form I-9 by December 8, 2021, the date by which Plaintiff learned of the disputed statement.[4]

Plaintiff's remaining amendments, which are either futile or irrelevant, fail to salvage her claims.  Those amendments seeking to better delineate the corporate relationships between Defendants are nonstarters when, simply put, Plaintiff cannot establish that Defendants are liable.  Similarly, Plaintiff's amendments seeking to more vehemently express her disagreement with Guidant's onboarding process, or to clarify her interactions with Defendants that postdate the allegedly defamatory communication, are irrelevant for the reasons elaborated above.  (*See, e.g.*, SAC ¶¶ 32-33).  Accordingly, the Court denies Plaintiff's motion to amend.

---

[4]     The factual allegations set forth in Plaintiff's Declaration of Facts, even if the Court could consider them, do not aid her cause.  (Dkt. #59-1 ("Pl. Decl.")).  The Declaration does little more than amplify Plaintiff's multiple refusals to provide her Form I-9 to Haddad and reformulate Plaintiff's criticisms of Guidant's onboarding process.  (*See* Pl. Decl. ¶¶ 15-17).  *Shah* v. *Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint").  Neither tack changes the Court's conclusion that the allegedly defamatory statements are non-actionable.  Indeed, the new details only provide further support for the finding that Plaintiff refused to submit the necessary documents for the verification of her Form I-9.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and Plaintiff's motion to amend is DENIED.  The Clerk of Court is directed to terminate the motions pending at docket entries 50 and 54, and to close this case.

SO ORDERED.

Dated:  November 17, 2023
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge